## AFFIDAVIT

I, Douglas E. Porrini, being duly sworn depose and state as follows:

This Affidavit is in support of a request for search warrants for the following devices:

### SEIZED AT 1809 STEPHANIE LN., AKRON, OH
### (residence of PATRICK GRIFFIN)

- Target Cellular Telephone #1: Black Apple iPhone, model 5, IMEI 990002852527108;

- Target Cellular Telephone #2: Kurio, model C13200, serial number KN5R-Z3HC-LCC3-32265-505-1;

- Target Cellular Telephone #3: Qualcomm ESPN, model Sanyo MVP, ESN HEX 0448C8D0 5Z;

- Target Cellular Telephone #4: LG, model LS620Y, MEID HEX A00000347E74D3;

- Target Cellular Telephone #5: Page Plus, model MOT W385, serial number 268435456204668583;

- Target Cellular Telephone #6: Apple IPhone, model 5C, IMEI 013889002026525;

- Target Cellular Telephone #7: Motorola, model Droid XT1254, FCC ID IHDT56PK1;

## SEIZED AT 984 VERNON ODOM BLVD., AKRON, OH
### (residence of FRANKLIN CONLEY)

- Target cellular telephone #8: LYNXX, model X25, serial Number 20130245985;

- Target cellular telephone #9: Apple iPhone, model A1522, IMEI 355878064157662;

- Target Cellular Telephone #10: LG, model LGL38C, serial number 306CYCCV1254955;

- Target cellular telephone #11: Samsung, model SGH-A157V, serial number R21DA76SCYF;

- Target Cellular telephone #12: LG, model AX500a, ESN HEX 1751B7D1;

- Target Cellular telephone #13: Nokia, model 6256i, ESN 026/00150913;

- Target Cellular telephone #14: Alcatel, model One touch, IMEI 014188008724996;

- Target Cellular telephone #15: Blackberry, model 9350, MEID HEX A00000000DC9302A;

- Target Cellular telephone #16: HTC, model Intruder, IMEI 358512033964745;

- Target Cellular telephone #17: Samsung, model SM-B311, HEX A000000CDA171A;

- Target Cellular telephone #18: Samsung, model SCH-U365, MEID HEX A00000458DBA94;

2

- Target Cellular telephone #19: Alcatel, model One touch, IMEI 013912008233299;

- Target Cellular telephone #20: Sanyo, model MVKY3820BK, MEID HEX A0000012C28039;

- Target Cellular telephone #21: HTC, model 8925, serial number HT751G004528 T02;

- Target Cellular telephone #22: LG, model E-739, serial number 204KPUU320094;

- Target Cellular telephone #23: Apple iPhone, model A1453, IMEI 352004061985244;

- Target Cellular telephone #24: Apple iPhone, model A1453, IMEI 358806057053645;

- Target Cellular telephone #25: Apple iPhone, model A1453, IMEI 352000068574361;

- Target Cellular telephone #26: LG, model 441G, serial number 502CYZP092333;

- Target Cellular telephone #27: Alcatel, model 2017B, MEID DEC 270113183512945363;

- Target Cellular telephone #28: Samsung, model SM-B311V, MEID HEX A00000481384D4;

- Target Cellular telephone #29: Samsung, model B311V, MEID HEX A000004815D88;

- Target Cellular telephone #30: Kyocera, model R727A, MEID 268435459905110152;

- Target Cellular telephone #31: Lynxx, model X2s, Serial number 20130083488.

## SEIZED DURING TRAFFIC STOP ON OHIO TURNPIKE

## From 2015 Chevrolet Traverse OH-GLT5348

- Target Cellular telephone #32: LG, model LGL38C, serial number 306C0LH1114008;

- Target Cellular telephone #33: Kyocera, model S2151, DEC 268435462509943505;

- Target Cellular telephone #34: Kyocera, model S3150, DEC 268435462507412381;

- Target Cellular telephone #35: Lynxx, model X25, S/N 20130104162;

- Target Cellular telephone #36: Samsung, model SCH365HPP, MEID HEX A00000458DCB26;

- Target Cellular telephone #37: Samsung, model SCHGUSTO3, MEIDHEX A00000076DB30D;

- Target Cellular telephone #38: Samsung, model SCH-U365, MEIDHEX A00000458A41D7;

- Target Cellular telephone #39:  Apple iPhone, model A1533, IMEI 3888008043914;

- Target Cellular telephone #40: Black Apple iPhone, model A1349, FCC ID BCG-E2422B;

- Target Cellular telephone #41: Blue Apple iPhone, model A1532, IMEI 013837002836633.

**From 2006 Audi A8 OH-GNE9949**

- Target Cellular telephone #42: Samsung, model SPH-L710, HEX 99000335081189;

- Target Cellular telephone #43: T-Mobile, model One touch 768T, IMEI 013303000908437.

1.    I am an "Investigative or Law Enforcement Officer" within the meaning of Title 18, United States Code, Section 2510(7) as a Special Agent (SA) of the FBI. I am empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.    As further described herein, this application seeks permission to locate not only electronically stored information that could serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence is on the devices because data on the storage medium can provide evidence of a file that was once on the storage

5

medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

3.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the electronic devices were used, the purpose of their use, who used them, and when.

4.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

5.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

6.   The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer and/or cellular telephone is evidence may depend on other information stored on the computer and/or cellular

telephone and the application of knowledge about how a computer and/or cellular telephone behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

7. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

8. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

9. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## TRAINING AND EXPERIENCE OF AFFIANT

10.  I have been employed by the FBI since June of 2002, and have been assigned to the Cleveland Division, Akron Resident Agency, since February 2010, where I am detailed to the Summit County (Ohio) Drug Unit.  Prior to employment with the FBI, I was a police officer in the Village of Silver Lake, Ohio, for three years and a Police Officer with the City of Twinsburg, Ohio, for ten years.  Based on my training and experience in these positions, I know the following:

a) That drug traffickers very often place assets, including telephones, in names other than their own to avoid detection of these assets by government agencies and to make it difficult to tie the asset(telephone)to them;

b) That even though these assets are in other person's names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

c) That large-scale narcotic traffickers usually maintain on hand (including in their homes and automobiles) large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

d) That narcotic traffickers often maintain books, records, receipts, ledgers, airline tickets, and money orders to assist in the distribution of controlled substances;

e) That narcotic traffickers usually provide narcotics on

consignment to their associates and maintain records through receipts, notes, and ledgers that are easily accessible to the traffickers;

f) That it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence and/or business, and often in automobiles, for their ready access and to conceal them from law enforcement authorities;

g) That drug traffickers commonly maintain addresses or telephone numbers in books, papers, or on electronic media including "smart phones," which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

h) That drug traffickers take or cause to be taken photographs of them, their associates, their property, and their product.  That these traffickers usually maintain these photographs in their possession and often on electronic media including "smart phones;" and

i) That persons engaged in drug trafficking and other criminal activities conceal in their electronic devices, including, but not limited to, cellular telephones and tablet computers, the contact information of drug suppliers, customers and/or couriers including addresses,

9

telephone and pager numbers, records relating to drug and financial transactions, and that sometimes these records are in code;

j) That individuals involved in narcotics trafficking and other criminal activities often utilize multiple cellular telephones, tablet computers and other electronic devices with video/photographic capabilities to record various aspects of their lives, including their drug trafficking activities;

k) That drug traffickers and other criminals often depend upon multiple electronic communication devices to maintain extensive contacts throughout the country. These communications systems expedite the transportation of drugs from the main source of supply, through the drug distribution network and eventually to the end drug user. To do this, continued access to electronic communication devices is essential to maintaining long distance and local contacts. Electronic communications are essential to drug traffickers due to the vast distances involved in moving narcotics and coordinating the delivery of those narcotics to couriers and, ultimately, street-level drug dealers. I have personally seized electronic communication devices from drug traffickers in the past. Information from these devices has provided valuable

information regarding suspected criminal associates that has assisted several criminal investigations, including the cellular telephone number of the particular device, incoming and outgoing call data, dates and times of telephone calls, address book information (names and associated telephone numbers), records and content of incoming and outgoing text and/or multimedia messages, and missed, received and dialed calls.  Cellular telephones can also store internet and Global Positioning System (GPS) location information indicating areas to which the individual using the telephone has travelled, internet searches performed as well as web pages visited. Information and data that is stored on these electronic devices can remain stored on the device indefinitely.

## BASIS OF INFORMATION

11.  Except as otherwise noted, the information set forth in this Affidavit has been provided to me by members of the Greater Akron Area High Intensity Drug Trafficking Area's Task Force (a multi-agency federal and local task force hereinafter referred to as GAASSTF) and other law enforcement agents or officers.  Unless otherwise noted, whenever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I

have read and reviewed.  Likewise, information resulting from physical surveillance, except where otherwise indicated, does not necessarily set forth my observation, but rather has been provided directly or indirectly through members of the HIDTA, other FBI Special Agents, or other law enforcement officers who conducted the surveillance.  Likewise, any information pertaining to vehicles and/or registrations, personal data on subjects, and record checks has been obtained through the Law Enforcement Automated Data System (LEADS) from the State of Ohio or the National Crime Information Center (NCIC) computers.

12.  All subscriber, toll record, pen register and trap and trace information referenced herein was obtained by court order or subpoena.

13.  On June 11, 2015, United States Magistrate Judge Kathleen B. Burke, Northern District of Ohio, authorized and signed search warrants for 984 Vernon Odom Blvd., Akron, Ohio, and 1809 Stephanie Ln., Akron, Ohio, and also authorized and signed criminal complaints against FRANKLIN CONLEY and PATRICK GRIFFIN.  The search warrants were executed at both residences on June 12, 2015.  CONLEY was arrested pursuant to an arrest warrant.

14.  On July 1, 2015, CONLEY and GRIFFIN were Indicted in the Northern District of Ohio, Eastern Division, for Extortion, in violation of Title 18, United States Code, Section 1951 (a)

and knowingly and intentionally using a telephone to facilitate acts constituting a felony under Title 21, United States Code, Section 843(b).

15. Because this Affidavit is being submitted for the limited purpose of securing authorization for securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for the requested search warrants.

**BACKGROUND**

16. In February of 2015, the Victim began receiving cellular telephone calls from CONLEY and/or GRIFFIN, in which they threatened the Victim and the Victim's family with serious physical harm, including death, if the Victim did not provide them with between $65,000 and $175,000 or introduce them to a large-scale drug distributor.

17. CONLEY and GRIFFIN claimed the Victim's brother had provided CONLEY with the name of a Mexican drug dealer while CONLEY and the victim's brother were incarcerated together. (Jail records indicate FRANKLIN D. CONLEY entered Oriana House on March 27, 2014 and was released on February 15, 2015). CONLEY and the Victim's brother shared a dormitory at Oriana House sometime between March 7, 2014, and August 27, 2014. CONLEY is currently on Federal Supervised Release for a 2011

felon in possession of a firearm conviction.)  CONLEY and
GRIFFIN advised that they met with the Mexican drug dealer who
ripped them (took their cash and provided no product) for a
large amount of money, between $65,000 an $125,000.  CONLEY and
GRIFFIN asserted that since the Victim's brother referred them
to the Mexican drug dealer, as a source of illegal narcotics, he
was responsible for their losses.  After the Victim's brother
advised he could not pay, CONLEY and GRIFFIN began contacting
the Victim since they believed he would have large sums of money
because of his current and past professions.

   18.  CONLEY and/or PATRICK GRIFFIN, began calling the
Victim on a regular basis and demanded either money or the name
of a source of illegal drugs. They threatened the Victim on many
occasions over approximately a four month period. The threats
were always delivered over cellular telephones, either by voice
conversations or by text messaging. The threats were
consistently demands for money or for a source of illegal drugs.
If the Victim did not deliver they always left the Victim with
the express threat and sometimes an implied threat of harm to
the Victim and or members of his family. These threats continued
from late February 2015 through at least the end of May, 2015.
The Victim noted that the calls from CONLEY came from telephone
number (330)962-1109 and that the calls from GRIFFIN came from
telephone number (330)414-2058.  Additionally, the Victim had

received cellular telephone calls and text messages from CONLEY calling from telephone numbers (234) 817-8261 and (330) 701-7784.

## FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE

19.  On April 25, 2015, GRIFFIN sent the following text from (330) 414-2058, "Bro can u please answer the phone.  I jus got one question."

20.  On May 2, 2015, GRIFFIN sent the following text message, "That's crazy, I thought we was better than that.  U can't even answer ur gone like a man, but u keep talking to him, all I'm asking r u gonna solve the situation either way, cuz I'm not bout to keep letting u play us like we retarded, u say one thing then all of a sudden switch it to another..."

21.  Between May 1 and May 2, 2015, the Victim had the following text message exchange with CONLEY.  CONLEY was utilizing cellular telephone number (330) 962-1109.

Victim:    "I can't leave tomorrow have to host the cap city marathon"  (Victim then sent a link to CONLEY.)

CONLEY:    "So wat Sunday den so we bck 2 dis den huh u gave me yo word bro datz crazy"

Victim:    "Bro did you just not see the picture?  Or you can just have your boy hit me up and I can write the check for 70K to his hospital and we can be done with it"

CONLEY:  "He dnt wnt 2 do dat jus write the cheack 4 75 den wat bout the other 100 den"

Victim:  "What about it?  It's seems like yall really got the game all twisted cause in reality don't nobody owe nothing!!!  Yall made moves on your own account ain't nobody force nothing on nobody.  I was doing a solid."

CONLEY:  "Yea and dat was kool wit me long as u hook me up wit buddy 2 make more cash tht would've made up 4 evrthing"

Victim:  "That was the plan.  But I ain't on no forced dispatch type stuff fam"

CONLEY:  "now u bckn out on the deal u gve me dat date I aint fore nothn u told me wn u can leave.  All u had 2 do was hook me up"

22.  On May 5, 2015, the Victim received threatening calls from CONLEY.  CONLEY told the Victim they will "go to war" over this.  CONLEY told the victim that he had "people from out of town" that would come and handle the issue for him.  CONLEY also advised the Victim that he gave his lawyer $20,000 in case something happens.  The Victim understood this to mean that CONLEY might be planning to do a violent act and is paying an attorney up front to represent him if he gets arrested.  CONLEY demanded $175,000.

16

23.   On May 8, 2015, the Victim attempted to place several telephone calls to CONLEY at telephone numbers (330) 962-1109, (330) 809-7693 and (234) 817-8261 with no contact.   CONLEY called the Victim back at approximately 2:39 p.m. from (234) 817-8261.   During the consensually monitored telephone call CONLEY made several threats to the Victim.   CONLEY advised, "I swear to God nigga you gonna feel me nigga…I'll beat another murder case (UNINTELLIGIBLE)…I'll beat another one nigga…you gonna feel me…I'll beat another one nigga.   I'll pay fifty thousand to beat another one."   The victim is aware that CONLEY was charged with murder regarding a homicide which occurred in Akron, Ohio, on June 6, 2011.   CONLEY was acquitted of the charges related to that death.   CONLEY also advised, "You walk around here like everything's cool…that shoulda been your number one priority nigga…that shoulda been your number one priority to give me my shit, that's a hundred and seventy-five…I'm willing to die…I'm gonna beat another one…give the police this phone…this phone ain't to me."   The Victim believes CONLEY was advising that the Victim should have paid the $175,000 and that CONLEY is willing to kill the Victim.   CONLEY also told the Victim, "tired of playing.   I gotta hundred niggas…all murderers…"   The victim asked CONLEY, "What's it going to take to get this squared away…to keep my family safe?"   CONLEY answered, "All you had to do was do that from the get go.   Why

17

we gotta go through all this?"  CONLEY said, "How could you look your people in the eyes when you can help them…you just dead wrong.  You feeding them to the wolves.  You dead wrong."

24.  On May 9, 2015, the victim and GRIFFIN exchanged the following text messages.  GRIFFIN was using telephone number (330) 414-2058:

GRIFFIN:  "Whats up bro I was just check that statues of that situation."

Victim:  "I have 40K now.  My financial quarter ends the 28th so will have more then.  LMK how you want to proceed."

GRIFFIN:  "If you want.  My little brother can meet you today and get that 40 and I can get the rest and I can't get the rest when you get everything situated."

Victim:  "OK I'll text you once I land."

GRIFFIN:  "Okay Bro I will be waiting.  Is it going to be today."  Approximately three hours later GRIFFIN texted, "Did you land yet cause my Lil bro ready.  You don't got nothing to worry about he don't hang with nobody."

25.  On May 14, 2015, the Victim placed a consensually recorded telephone call to GRIFFIN at telephone number (330) 414-2058.  The Victim advised GRIFFIN he was calling to give GRIFFIN an update on the situation.  The Victim advised, "I told him I'm gonna try just to get you all the money.  I'm still

18

working on it." GRIFFIN asked, "…ok. How long do you think it's gonna be?" The Victim discussed how he was attempting to get the money from various locations including banks. The Victim advised, "I might be able to get some of it sooner. If so, do you want me to just call you direct?" GRIFFIN advised, "Yeah, just call me direct."

26. On May 29, 2015, the Victim spoke with his brother who advised that CONLEY was blowing up his telephone. The Victim's brother advised the Victim that GRIFFIN called and advised he was done playing around and was having "guys from California" come in to take care of it. GRIFFIN also advised the Victim's brother that the Victim had blocked GRIFFIN's and CONLEY's telephone numbers, which the Victim had done.

27. On May 31, 2015, CONLEY sent two text messages from (330) 701-7784 and advised, "U cant run 4 long my nigga we gn gt u and datz on my mom and yurs 2". The second text read, "U lucky u aint meet me yesterday broke ass nigga". Keep thinkin a nigga jus talkn." The Victim sent a text message back to CONLEY which read, "Clown". CONLEY responded with, "Man u a pussy ass nigga."

28. Additionally on May 31, 2015, the Victim and CONLEY had several consensually recorded telephone conversations, in which CONLEY used (330) 701-7784. During the first conversation

CONLEY advised, "I'm gonna get you.  I'm gonaa get you Nigga.
You lucky I didn't get your whole family."  CONLEY then
referenced the Police but the conversation is hard to
understand.  The Victim then asked, "What do I need the Police
for?"  CONLEY then referenced that "his" niggas were coming to
take care of the situation.  During the second conversation on
the same day, CONLEY advised, "You gonna feel me nigga.  We
gonna see each other."  The Victim then asked, "So why do you
keep calling me?"  CONLEY said, "Ain't nothing else to talk
about.  You ain't giving a nigga no money.  You gonna pay for it
with your ass."  CONLEY later advised, "This is on my momma and
your momma and your brother and whoever else."  The Victim,
during the conversation advised, "You made threats to my
brother."  CONLEY responded by saying, "I made threats to you,
not your brother."  The Victim stated, "Your man Pee Wee
(GRIFFIN) said he got people in from California."  CONLEY
advised, "You know this shit ain't going away."  CONLEY and the
Victim had two additional calls.  During the fourth call CONLEY
advised, "Like I said, don't get the police when we get on your
ass.  Don't get the police when we get on your ass.  You know
what though, fuck you and the police."

29.  Affiant has reviewed toll records associated with
CONLEY and GRIFFIN in reference to cellular telephone calls and
text messages between them and the Victim.  The below chart

20

indicates the amount of cellular telephone calls and text messages between CONLEY's and GRIFFIN's telephones and the Victim's telephone:

| TELEPHONE | SUBSCRIBER | NO. OF CALLS/ LAST CALL |
|---|---|---|
| 330.962.1109 | Subscriber: Yo Gatti (prepaid) Used by: **CONLEY** | 487 outgoing calls (To Victim) 36 incoming calls (From Victim) 02/23/15 to 05/12/15 |
| 234.817.8261 | Subscriber: Unknown Used by: **CONLEY** | 19 outgoing calls (To Victim) 4 incoming calls (From Victim) 05/05/15 to 05/08/15 |
| 330.414.2058 | Subscriber: Natorria C. Clark Used by: **GRIFFIN** | 21 outgoing calls (To Victim) 3 incoming calls (From Victim) 04/20/15 to 05/03/15 |
| 330.701.7784 | Subscriber: JOE JOE Used by: **GRIFFIN** | 28 outgoing calls (To Victim) 3 incoming calls (From Victim) 05/26/15 to 06/01/15 |

30. On June 9, 2015, at approximately 11:30 a.m., I began reviewing precise cellular telephone location data for telephone number (330) 701-7784. The first location data placed the telephone at 984 Vernon Odom Blvd., Akron, Ohio, with an accuracy of 19 meters. Surveillance units observed several vehicles at 984 Vernon Odom Blvd. associated with CONLEY and his girlfriend. Subsequent location data throughout the day placed

21

the telephone at 984 Vernon Odom Blvd. with varying accuracy.
At approximately 2:43 p.m. location data placed the telephone at
902 Oakland Ave., Akron, Ohio, with an accuracy of 19 meters.
At approximately 3:00 p.m. location data showed the telephone at
897 Oakland Ave., Akron, Ohio, with an accuracy of 19 meters.
CONLEY's mother lives at 902 Oakland Ave., Akron, Ohio.

31.  On June 10, 2015, at approximately 2:07 a.m., location
data showed the telephone returned to 984 Vernon Odom Blvd. with
an accuracy of 21 meters.  According to location data the
telephone did not leave the area of 984 Vernon Odom Blvd. until
1:09 p.m. on June 10, 2015.  Location data showed the telephone
traveled from 984 Vernon Odom Blvd. to 902 Oakland Ave., Akron,
Ohio, accuracy of nine meters, where surveillance units
positively identified CONLEY getting out of the 2015 Chevrolet
Traverse with Ohio plate GLT5348.

32.  It is clear the four cellular telephones listed in the
chart above were used by CONLEY and GRIFFIN, in their
extortionate and threatening criminal behavior directed at the
victim. It is also clear that CONLEY and GRIFFIN were involved
in a conspiracy to distribute controlled substances as they
claimed to be upset over not receiving drugs from the Mexican
drug dealer the Victim's brother referred them to. They either
wanted their lost money covered or they would have been just as

22

satisfied if the Victim referred them to a source of drugs and thus a continuous flow of income.

33. On June 11, 2015, Ohio State Highway Patrol (OSP) troopers stopped two vehicles traveling west on the Ohio Turnpike near Milepost 67. One vehicle, a 2015 Chevrolet Traverse with Ohio registration GLT5348, was occupied by Antione Conley, FRANKLIN CONLEY's uncle, and Markisha Mcalister, FRANKLIN CONLEY's girlfriend. Troopers located approximately $150,000 in U.S. currency inside the vehicle. The occupants advised that they were purchasing a bar in Chicago, Illinois, with the money. A second vehicle, a 2006 Audi A8 with Ohio registration GNE9949, trailing closely behind the first vehicle, was stopped nearby. Troopers identified Jerome Walton as the driver. The vehicle was registered to Antione Conley. Troopers located a modified compartment in the center console of the second vehicle. Troopers also located 12 cellular telephones between the two vehicles. According to precise location data for telephone number (330) 701-7784, the telephone associated with this telephone number was inside one of the vehicles stopped on this day. I know from my training and experience, and from my involvement in this investigation, that a car, such as here, loaded with bulk cash, for which the occupants give a questionable explanation, westbound on the Ohio Turnpike, (thus traveling in the direction of two control substance source

cities, Detroit and Chicago), with multiple cellular telephones inside followed by a "chase car," is indicia of drug trafficking. Further it raises probable cause to believe that the occupants of the cars are traveling to meet a source of illegal drugs and at least are going to pay that source for product. There is also probable cause to believe that the numerous cellular telephones found in the cars contain evidence of and drug trafficking. Further the  cellular telephone bearing telephone number (330) 701-7784, is evidence of and contains evidence of the extortionate conduct described earlier herein.

34.    The telephones seized from the vehicles by OSP Troopers were transferred to me.  The telephones seized during the traffic stop are listed as **Target Telephone #32 through Target Telephone #43**.

35.    On June 12, 2015, GAASSTF investigators executed two search warrants.  The first search warrant was executed at 984 Vernon Odom Blvd., Akron, Ohio, the residence of FRANKLIN CONLEY and 1809 Stephanie Ln., Akron, OH, the residence of PATRICK GRIFFIN.

36.    CONLEY was present at 984 Vernon Odom Blvd., Akron, Ohio, at the time the warrant was executed, as well as Markisha Mcalilster.   Investigators searched the residence and located 24 cellular telephones inside the residence.   Those telephones are listed as **Target Telephones #8 through Target telephone #31**.

37.  GRIFFIN was present at 1809 Stephanie Ln., Akron, Ohio, at the time the warrant was executed.  Investigators searched the residence and located seven cellular telephones. Those telephones are listed as **Target Telephone #1 through Target Telephone #7**.  Also recovered at the residence was a Ruger 9mm handgun, approximately 107 grams of heroin, drug paraphernalia used to distribute narcotics and $9,340 in U.S. currency.  GRIFFIN was interviewed at the search location and advised that the heroin and U.S. currency belonged to CONLEY. GRIFFIN stated that CONLEY dropped off the heroin the day before the search warrant.  GRIFFIN advised that CONLEY would leave drugs at GRIFFIN's house because they felt the police would not look in GRIFFIN's residence because of GRIFFIN's medical condition.  Additionally, the box containing the heroin was sent to the Bureau of Criminal Investigation for fingerprint analysis.  It was determined that CONLEY's fingerprint was found on the box containing the heroin.

38. Based on training and experience, and on the facts developed in this investigation, I assert there is probable cause to believe that the numerous cellular telephones found in the houses are evidence of, and contain evidence of illegal drug trafficking in violation of 21 U.S.C. §§ 846 and 841(a)(1). Further, there is probable cause to believe that the cellular telephones bearing # (234)817-8261, (330)414-2058, (330)701-

7784, and (330)962-1109 also contain evidence of violations of

18 U.S.C. § 1951 for Extortion and 18 U.S.C. § 843(b) for use of

a telephone communication facility to facilitate a drug

trafficking offense.

### CONCLUSION

39.  Based on the foregoing information I believe there is

probable cause to believe that the aforementioned devices are

and contain evidence of violations of United States laws,

specifically Extortion, in violation of 18 U.S.C. § 1951,

Interstate Communications of Threats, in violation of 18 U.S.C.

§ 875(b), and Conspiracy and Possession with the intent to

distribute a controlled substance, in violation of 21, U.S.C.

§§, 841(a)(1), and 846.

_____
SA Douglas E. Porrini
Federal Bureau of Investigation


Sworn to and subscribed before me this /8th day of August,
2015.


_____
KATHLEEN B. BURKE
United States Magistrate Judge